1

**KESSLER TOPAZ MELTZER
  & CHECK, LLP**

2

JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)

3

One Sansome Street, Suite 1850
San Francisco, CA 94104

4

Tel:  (415) 400-3000
Fax: (415) 400-3001

5

6

*Counsel for Plaintiff Barry G. Depot*

7

8

**UNITED STATES DISTRICT COURT**

9

**NORTHER DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| BARRY G. DEPOT, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC. f/k/a FACEBOOK, INC., MARK ZUCKERBERG, DAVID M. WEHNER, SUSAN J.S. TAYLOR, and NICK CLEGG,<br><br>             Defendants. | Case No. 4:21-cv-08873<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Barry G. Depot ("Plaintiff"), by and through his counsel, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta," "Facebook," or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.   This is a federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Facebook common stock between April 29, 2021, and October 21, 2021, inclusive (the "Class Period").  The claims asserted herein are alleged against Meta and certain of the Company's senior executives, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.   Meta, a Delaware corporation with principal executive offices in Menlo Park, California, is one of the world's largest technology companies.  The Company operates through two business segments: (1) "Family of Apps," which includes its Facebook, Instagram, Messenger, and WhatsApp platforms; and (2) "Reality Labs," which includes augmented and virtual reality related consumer hardware, software, and content.  On October 28, 2021, the Company announced that it had changed its name from "Facebook, Inc.," to "Meta Platforms, Inc."

3.   This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations.  Specifically, Defendants repeatedly and falsely touted the Company's commitment and ability to prevent the spread of damaging misinformation, criminal activity, and other harmful content on its social media platforms, while simultaneously concealing the Company's dependence upon toxic content and inauthentic accounts to drive revenues.

4.      The truth about Defendants' false and/or misleading statements began to emerge on September 13, 2021, when *The Wall Street Journal* started to publish "The Facebook Files"—a series of articles based on documents provided to *The Wall Street Journal* and the SEC by Frances Haugen, a former Facebook employee.  The Facebook Files revealed that, among other things: (1) the Company exempts notable users such as celebrities and politicians from its normal enforcement rules preventing users from engaging in harmful speech and misled its own Oversight Board about this practice; (2) the Company has long been aware that its Instagram platform harms teenage users, including by negatively affecting their body image and increasing anxiety, depression, and suicidal thoughts; (3) changes to Facebook's algorithm resulted in angrier and more divisive content, and Facebook declined to correct this problem in order to prioritize increased user engagement; (4) Company decision makers have ignored warnings that the Company's platforms are used to incite violence against ethnic minorities, lure vulnerable women into abusive situations, and recruit hit men, among other criminal conduct; and (5) Company executives, including Chief Executive Officer Mark Zuckerberg, have been unable to prevent the Company's platforms from actively undermining efforts to vaccinate people against COVID-19.  On the whole, The Facebook Files painted a picture of a company that is generally unable or unwilling to ensure that its products do not cause harm.  To the contrary, (secretly) increasing harmful content was central to growing Facebook's business.  In response to the first five articles in The Facebook Files series, the price of Company common stock declined $13.97 per share, or nearly 4% across five trading days, from a close of $378.69 per share on September 10, 2021, to close at $364.72 per share on September 17, 2021.

5.      Additional corrective information surfaced after the market closed on September 21, 2021, when *The New York Times* reported that the Company had recently initiated "Project Amplify," in which the Company uses Facebook's News Feed to show users positive stories about Facebook itself—a marked departure from Facebook's existing policies.  On this news, the price of Company common stock further declined $14.27 per share, or approximately 4%, from a close of $357.48 per share on September 21, 2021, to close at $343.21 per share on September 22, 2021.

6.      Then, on October 3, 2021, 60 Minutes broadcasted an interview with Frances Haugen, in which she revealed herself as the source of the leaked documents and stated that when presented

with "conflicts of interest between what was good for the public and what was good for Facebook," Facebook consistently chose "to optimize for its own interests." Haugen further explained that she took action to reveal Facebook's secrets to the public after she saw that, while Facebook employed certain efforts against misinformation prior to the 2020 election, the Company dissolved those efforts after the election in order to "prioritize growth over safety"—even though election-related misinformation continued to spread and contributed to the January 6, 2021 insurrection at the U.S. Capitol. In response to Haugen's interview, the price of Company common stock declined $16.78 per share, or nearly 5%, from a close of $343.01 per share on October 1, 2021, to close at $326.23 per share on October 4, 2021.

7.     After the markets closed on October 21, 2021, *The Wall Street Journal* reported that Facebook "is struggling to detect and deal with users' creating multiple accounts on its flagship platform, according to internal documents that raise new questions about how the social-media giant measures its audience." According to these documents, "the phenomenon of single users with multiple accounts [is] 'very prevalent' among new accounts" with "an examination of roughly 5,000 recent sign-ups on the service indicat[ing] that at least 32% and as many as 56% were opened by existing users." On this news, the price of Company common stock declined $17.27 per share, or approximately 5%, from a close of $341.88 per share on October 21, 2021, to close at $324.61 per share on October 22, 2021.

8.     As a result of Defendants' wrongful acts and omissions, and the resulting declines in the market value of the Company's common stock, Plaintiff and other members of the class have suffered significant damages.

## II.     JURISDICTION AND VENUE

9.     Plaintiff's claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), because the Company is headquartered in this District, Defendants

1   conduct business in this District, and many of the acts and conduct that constitute the violations of

2   law complained of herein, including the preparation and dissemination to the public of materially

3   false and misleading information, occurred in this District.

4        11.   In connection with the acts, conduct, and other wrongs alleged in this Complaint,

5   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

6   including, but not limited to, the United States mails, interstate telephone communications, and the

7   facilities of the national securities markets.

8   **III.   PARTIES**

9        12.   Plaintiff, as set forth in the accompanying certification, incorporated by reference

10  herein, purchased Company common stock at artificially inflated prices during the Class Period and

11  suffered damages as a result of the violations of the federal securities laws alleged herein.

12       13.   Defendant Meta is a Delaware corporation with its principal executive offices located

13  at 1601 Willow Road, Menlo Park, California 94025.  The Company's common stock currently trades

14  on the NASDAQ under the ticker symbol "FB," and will begin trading under the ticker symbol

15  "MVRS" on December 1, 2021.

16       14.   Defendant Mark Zuckerberg ("Zuckerberg"), the Company's founder, is, and was

17  throughout the Class Period, the Company's Chief Executive Officer and Chairman.

18       15.   Defendant David M. Wehner ("Wehner") is, and was throughout the Class Period, the

19  Company's Chief Financial Officer.

20       16.   Defendant Susan J.S. Taylor ("Taylor") is, and was throughout the Class Period, the

21  Company's Chief Accounting Officer.

22       17.   Defendant Nick Clegg ("Clegg") is, and was throughout the Class Period, the

23  Company's Vice President of Global Affairs and Communications.

24       18.   Defendants Zuckerberg, Wehner, Taylor, and Clegg are collectively referred to herein

25  as the "Individual Defendants."

26       19.   The Individual Defendants, because of their positions with the Company, possessed

27  the power and authority to control the contents of the Company's reports to the SEC, press releases,

28  and presentations to securities analysts, money and portfolio managers, and institutional investors,

i.e., the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

20.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.   **SUBSTANTIVE ALLEGATIONS**

### A.   **Background**

21.     Prior to the start of the Class Period, the Company has faced serious criticism from regulators, lawmakers, and the public regarding its contributions to the spread of dangerous misinformation and other damaging effects on society.

22.     In the wake of this scrutiny, Facebook attempted to rehabilitate its public image.  One of the Company's efforts to assure the public that it can be trusted was the creation of its Oversight Board: an independent collection of journalists, legal experts, human rights experts, and others who are purportedly tasked with keeping Facebook's content moderation and policy enforcement systems accountable.

23.     Zuckerberg announced the formation of the Oversight Board in November 2018 and the Oversight Board's founding members were named in May 2020.  Zuckerberg stated that the independence of the Oversight Board would "prevent the concentration of too much decision-making within our teams," "create accountability and oversight," and "provide assurance that these decisions are made in the best interests of our community and not for commercial reasons."

### B.   **Defendants' False and/or Misleading Statements**

24.     The Class Period begins on April 29, 2021, to coincide with the filing of Facebook's quarterly report for the first quarter of 2021 on Form 10-Q with the SEC (the "1Q21 10-Q").  The

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 4:21-cv-08873                                                                        5

1Q21 10-Q was signed by Defendants Wehner and Taylor.  The 1Q21 10-Q reported that Facebook generated $9.5 billion in net income on $26.17 billion in revenue.  The Company also stated:

> In response to the COVID-19 pandemic, we have focused on helping people stay connected, **_assisting the public health response_**, and working on the economic recovery.  We have also continued to invest based on the following company priorities: (i) continue **_making progress on the major social issues facing the internet_** and our company, including privacy, safety, and security; (ii) build new experiences that **_meaningfully improve people's lives_** today and set the stage for even bigger improvements in the future; (iii) keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and (iv) **_communicate more transparently_** about what we're doing and the role our services play in the world.[1]

25.     Defendants also stated in the 1Q21 10-Q that "[w]e believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets."

26.     On May 11, 2021, Defendants again touted the Company's COVID-19 efforts, explaining that, "[a]t Facebook, we're working to help meet [President Biden's] goal [for 160 million Americans to be fully vaccinated by July 4, 2021] by improving access to information about vaccines and how to get vaccinated, making it easier for people to share their support for vaccines, and reducing misinformation about vaccines."  Among other things, Facebook represented that:

> An important part of our work to increase vaccinations is to address content that violates our rules on COVID-19 and vaccine misinformation.  Over the course of the pandemic, we have removed more than 16 million pieces of this content from our apps for breaking our rules on COVID-19 and vaccine misinformation.  For certain content that does not break these rules, but could still discourage someone from getting vaccinated, we reduce its distribution on Facebook and remove it from recommendations on Facebook and Instagram.

27.     On May 26, 2021, the Company touted that it was "launching new ways to inform people if they're interacting with content that's been rated by a fact-checker as well as taking stronger action against people who repeatedly share misinformation on Facebook," explaining that "[w]hether it's false or misleading content about COVID-19 and vaccines, climate change, elections or other

---

[1] Unless otherwise noted, all emphasis is added.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 4:21-cv-08873                                                              6

topics, [the Company is] making sure fewer people see misinformation on [its] apps." According to Facebook, it emphasized that the Company has "taken stronger action against Pages, Groups, Instagram accounts and domains sharing misinformation and now, [Facebook is] expanding some of these efforts to include penalties for individual Facebook accounts too." Specifically, the Company indicated it "will reduce the distribution of all posts in News Feed from an individual's Facebook account if they repeatedly share content that has been rated by one of [Facebook's] fact-checking partners."

28.     That same day, during the Company's annual shareholder meeting, Defendant Clegg denied that the Company enforces its content moderation policies unevenly, stating that "our policies on hate speech, incitement and so on apply to everyone regardless of their position of power." Clegg further represented that "[w]e remove content that poses specific harm to people, content intended to intimidate, exclude or silence," and touted the Company's use of the Oversight Board "to make independent judgments on some of the biggest content decisions we make."

29.     On or about June 10, 2021, Facebook published its updated Keep Building Better; The Facebook Code of Conduct (the "Code of Conduct"), which applies to "[a]ll Facebook Personnel—from leaders to interns." In the Code of Conduct, Defendants touted that "Facebook is committed to maximizing the positive impact we have on people and society through all that we build."

30.     In connection with the Code of Conduct, Zuckerberg represented that:

> At Facebook, we build products and experiences to give people the power to build community and bring the world closer together.
>
> With that comes a deep responsibility to each other, to the communities we serve and to the world. I believe that embracing this responsibility allows us to innovate better - and be a better company.
>
> This Code of Conduct defines the expectations we have for how we act and how we make decisions. We should look to it when we have questions or face difficult trade-offs and gray areas.
>
> The importance of our work means we must all commit to holding ourselves to a high standard. This is why I expect everyone at Facebook—leaders, managers, individual contributors—to follow our Code of Conduct, advocate for others to do the same, and feel empowered to speak up if you need help or have questions.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 4:21-cv-08873                                                                                   7

31.     Among other things, the Code of Conduct highlighted the Company's commitment to "[i]nnovate responsibly" by:

- Consider[ing] a broad range of potential impacts on people, communities and society, looking across different dimensions of responsibility, such as inclusion, safety, privacy and others

- Rais[ing] and address[ing] potential harms early and often throughout the product development process

- Seek[ing] out expert voices, diverse perspectives and the resources and tools we have at Facebook to inform our decisions

- Engag[ing] in necessary reviews, such as Privacy Review and Integrity XFN review

- Design[ing] and build[ing] products that prioritize safety and privacy

- Work[ing] quickly to identify and remove harmful content from Facebook platforms, such as hate speech, harassment, child exploitation, threats of violence and terrorism

- Us[ing] and access[ing] internal tools with care and caution, only as necessary to do our job and never for personal gain or to assist a user in avoiding detection or penalty — Facebook has a zero tolerance for inappropriate use or access of internal tools

- Design[ing] and build[ing] products that prioritize safety, privacy, provide appropriate warnings where necessary and articulate instructions for safe and responsible use

32.     Defendants further touted the Company's commitment to "empower[ing] people to create a better, more sustainable world through actions, tools and resources that have real-world impact."   For example, Defendants stated that the Company must "[r]espect and promote human rights, including supporting better working conditions and prohibiting human trafficking across Facebook and Facebook supply chains."

33.     The Code of Conduct similarly represented that the Company is committed to "prevent[ing] criminal activity" by, among other things, "follow[ing] the Company's policies, procedures and internal controls that are designed to prevent bad actors from utilizing payment platforms to launder money and engage in other illegal activity."

34.     Ultimately, Defendants assured the public that "[w]hen Facebook learns about a potential violation of law, this Code or any of Facebook's policies, the Company will take action."

35.     On June 15, 2021, the Company announced that the Oversight Board had "accepted its first policy advisory opinion referral from Facebook," regarding the Company's policy on privacy violations and image privacy rights.  In touting the Oversight Board's role, the Company further explained that "the board's guidance on our policies is a critical input into our policy development process," and that "[t]hrough policy advisory opinions, the board will shape the development and enforcement of the policies that apply to more than 3 billion people across our apps."

36.     On June 30, 2021, Defendants published the Company's Anti-Slavery and Human Trafficking Statement 2021 (the "ASHT Statement").   In the ASHT Statement, Defendants represented that "Facebook is opposed to all forms of human trafficking, slavery, servitude, forced or compulsory labor, and all other trafficking-related activities," and that Facebook is "committed to fully complying with all applicable international human rights standards, labor and employment laws, rules, and regulations, and to working to mitigate the risks of modern slavery and human trafficking in our business operations and supply chains."

37.     Among other things, the ASHT Statement also claimed that Facebook opposes "the abuse of [its] products to facilitate any form of human exploitation," including implementing policies in 2020 designed to "prohibit content or behaviors that may lead to human exploitation," increasing its "investments and ability to identify the illicit actors, networks, organizations, and businesses that perpetrate [human exploitation] and disrupt them accordingly," and "work[ing] closely with key anti-trafficking experts" on Facebook's "policies, awareness raising, and prevention solutions."

38.     The ASHT Statement further represented that "Facebook requires that our personnel are trained on and comply with the <u>Facebook Code of Conduct</u>, which affirms our commitment to human rights and prohibits violations of law." (emphasis in original).

39.     On July 15, 2021, Facebook published its first quarterly update regarding its Oversight Board and explained that the Company "regularly and proactively identif[ies] some of the most significant and difficult content decisions we've made on our platform and ask[s] the board to review them."  Specifically, Facebook represented that it "refer[s] cases involving issues that are severe,

large-scale, and/or important for public discourse" and "welcome [the Oversight Board's] recommendations." Defendants also noted that "the changes [the Oversight Board] have sparked make Facebook more transparent with users and the public, more consistent with our policy applications, and more proportional in our enforcement."

40.     On July 16, 2021, U.S. President Joe Biden commented that COVID-19 misinformation of social media platforms like Facebook was "killing people."

41.     The following day, July 17, 2021, the Company issued a statement chastising "the Biden administration [for having] chosen to blame a handful of American social media companies" for rising COVID-19 cases. In doing so, the Company claimed that "vaccine acceptance among Facebook users in the US has increased" and that "**Facebook is not the reason [President Biden's goal of vaccinating 70% of Americans by July 4] was missed**." (emphasis in original). The Company also touted its efforts to "promote reliable vaccine information" and stated that the Company has "devoted unprecedented resources to the fight against the pandemic."

42.     On or about July 29, 2021, Facebook filed its quarterly report for the second quarter of 2021 on Form 10-Q with the SEC (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Wehner and Taylor. The 2Q21 10-Q reported that Facebook generated $10.39 billion in net income on $29.08 billion in revenue. The Company also stated:

> In response to the COVID-19 pandemic, we have focused on helping people stay connected, ***assisting the public health response***, and working on the economic recovery. We have also continued to invest based on the following company priorities: (i) continue ***making progress on the major social issues facing the internet*** and our company, including privacy, safety, and security; (ii) build new experiences that ***meaningfully improve people's lives*** today and set the stage for even bigger improvements in the future; (iii) keep building our business by supporting the millions of businesses that rely on our services to grow and create jobs; and (iv) ***communicate more transparently*** about what we're doing and the role our services play in the world.

43.     Defendants also again represented, in the 2Q21 10-Q, that "[w]e believe the percentage of duplicate accounts is meaningfully higher in developing markets such as the Philippines and Vietnam, as compared to more developed markets."

44.     On August 18, 2021, Facebook published its Community Standards Enforcement Report for the second quarter of 2021, in which the Company represented that it is "committed to sharing meaningful data so we can be held accountable for our progress."  In connection with the report, the Company stated that the "[p]revalence of hate speech has decreased for three quarters in a row" due to "improvements in proactively detecting hate speech and ranking changes in [the Facebook] News Feed," and that the Company's removal of hate speech content had "increased over 15X on Facebook and Instagram since we first began reporting it."

45.     Defendants' statements about the Company's business and operations were materially false and/or misleading when made because Defendants' statements and omissions misrepresented the Company's commitment and ability to prevent the spread of damaging misinformation, criminal activity, and other harmful content on its social media platforms, while simultaneously concealing the Company's dependence upon toxic content to drive revenues.

**C.     The Truth Begins to Emerge**

46.     Investors began to learn the truth about the Company's content moderation policies, use of the Oversight Board, and continued dependence on toxic content and inauthentic accounts to drive revenue on September 13, 2021, when *The Wall Street Journal* began publishing The Facebook Files—a series of articles revealing a wide array of serious problems that Facebook is fully aware of but has failed to correct.  The Facebook Files were based on internal documents provided to *The Wall Street Journal* and the SEC by a Facebook whistleblower—later revealed to be former Facebook product manager Frances Haugen.  As *The Wall Street Journal* explained, The Facebook Files show that "Facebook Inc. knows, in acute detail, that its platforms are riddled with flaws that cause harm, often in ways only the company fully understands"—yet Facebook has not fixed these flaws.

47.     On September 13, 2021, *The Wall Street Journal* published the first of The Facebook Files articles, "Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt."  Therein, it was reported that, while "Mark Zuckerberg has publicly said Facebook Inc. allows its more than three billion users to speak on equal footing with the elites of politics, culture and journalism, and that its standards of behavior apply to everyone, no matter their status or fame," "[i]n private, the company has built a system that has exempted high-profile users from some or all

of its rules."   According to *The Wall Street Journal*, "[t]he program, known as 'cross check' or 'XCheck,' was initially intended as a quality-control measure for actions taken against high-profile accounts, including celebrities, politicians and journalists," but "[t]oday, it shields millions of VIP users from the company's normal enforcement process, the documents show."

48.   As explained by *The Wall Street Journal*, "[s]ome users are 'whitelisted'—rendered immune from enforcement actions—while others are allowed to post rule-violating material pending Facebook employee reviews that often never come."   For example, according to Company documents reviewed by *The Wall Street Journal*:

> XCheck has protected public figures whose posts contain harassment or incitement to violence, violations that would typically lead to sanctions for regular users.  In 2019, it allowed international soccer star Neymar to show nude photos of a woman, who had accused him of rape, to tens of millions of his fans before the content was removed by Facebook.   Whitelisted accounts shared inflammatory claims that Facebook's fact checkers deemed false, including that vaccines are deadly, that Hillary Clinton had covered up "pedophile rings," and that then-President Donald Trump had called all refugees seeking asylum "animals[.]"

49.   Moreover, *The Wall Street Journal* reported that:

> A 2019 internal review of Facebook's whitelisting practices, marked attorney-client privileged, found favoritism to those users to be both widespread and "not publicly defensible."

> "We are not actually doing what we say we do publicly," said the confidential review. It called the company's actions "a breach of trust" and added: "Unlike the rest of our community, these people can violate our standards without any consequences."

50.   Importantly, *The Wall Street Journal* also reported that, "[i]n describing the system, Facebook has misled the public and its own Oversight Board, a body that Facebook created to ensure the accountability of the company's enforcement systems," noting that, "[i]n June, Facebook told the Oversight Board in writing that its system for high-profile users was used in 'a small number of decisions'" despite the fact that "XCheck grew to include at least 5.8 million users in 2020."

51.   On September 14, 2021, *The Wall Street Journal* published the second of The Facebook Files articles, "Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show."   In this article, *The Wall Street Journal* reported that, "[f]or the past three years, Facebook

has been conducting studies into how its photo-sharing app affects its millions of young users" and that, "[r]epeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls."

52.     According to a March 2020 slide presentation reviewed by *The Wall Street Journal*, "[t]hirty-two percent of teen girls said that when they felt bad about their bodies, Instagram made them feel worse" and that "[c]omparisons on Instagram can change how young women view and describe themselves."   Similarly, the slide presentation said that "[t]eens blame Instagram for increases in the rate of anxiety and depression" and that "[a]mong teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram."   Critically, Facebook's internal researchers "came to the conclusion that some of the problems were specific to Instagram, and not social media more broadly," including the problems "concerning so-called social comparison, which is when people assess their own value in relation to the attractiveness, wealth and success of others."

53.     On September 15, 2021, *The Wall Street Journal* published the third of The Facebook Files articles, "Facebook Tried to Make Its Platform a Healthier Place.  It Got Angrier Instead." Therein, *The Wall Street Journal* reported that a 2018 change to Facebook's News Feed algorithm that amplified posts receiving "meaningful social interactions," including reshares and reactions, inadvertently rewarded users' outrage, resulting in an angrier and more divided platform, by amplifying posts.

54.     According to *The Wall Street Journal*, "[d]ata scientists on [Facebook's] integrity team—whose job is to improve the quality and trustworthiness of content on the platform—worked on a number of potential changes to curb the tendency of the overhauled algorithm to reward outrage and lies," but "Mr. Zuckerberg resisted some of the proposed fixes, the documents show, because he was worried they might hurt the company's other objective—making users engage more with Facebook."

55.     On September 16, 2021, *The Wall Street Journal* published the fourth of The Facebook Files articles, "Facebook Employees Flag Drug Cartels and Human Traffickers.  The Company's Response Is Weak, Documents Show."   According to *The Wall Street Journal*, internal documents

"show employees raising alarms about how its platforms are used [inappropriately] in some developing countries, where its user base is already huge and expanding," and "show the company's response, which in many instances is inadequate or nothing at all."

56.    For example, according to Company documents reviewed by *The Wall Street Journal*:

> Employees flagged that human traffickers in the Middle East used the site to lure women into abusive employment situations in which they were treated like slaves or forced to perform sex work. They warned that armed groups in Ethiopia used the site to incite violence against ethnic minorities. They sent alerts to their bosses on organ selling, pornography and government action against political dissent[.]

57.    However, internal documents reviewed by *The Wall Street Journal* further revealed that:

> When problems have surfaced publicly, Facebook has said it addressed them by taking down offending posts. But it hasn't fixed the systems that allowed offenders to repeat the bad behavior. Instead, priority is given to retaining users, helping business partners and at times placating authoritarian governments, whose support Facebook sometimes needs to operate within their borders[.]

58.    On September 17, 2021, *The Wall Street Journal* published the fifth of The Facebook Files articles, "How Facebook Hobbled Mark Zuckerberg's Bid to Get America Vaccinated." Therein, *The Wall Street Journal* reported that "Company documents show antivaccine activists undermined [Zuckerberg]'s ambition to support the rollout by flooding the site and using Facebook's own tools to sow doubt about the Covid-19 vaccine."

59.    Specifically, despite Zuckerberg "want[ing] his company to use its formidable resources to push 50 million people toward Covid-19 vaccines," internal documents reviewed by *The Wall Street Journal* showed that "Facebook researchers warned that comments on vaccine-related posts—often factual posts of the sort Facebook sought to promote—were filled with antivaccine rhetoric aimed at undermining their message." Similarly, "another memo said initial testing concluded that roughly 41% of comments on English-language vaccine-related posts risked discouraging vaccinations" while "[u]sers were seeing comments on vaccine-related posts 775 million times a day . . . and Facebook researchers worried the large proportion of negative comments could influence perceptions of the vaccines' safety."

60.     According to *The Wall Street Journal*, "[d]espite Mr. Zuckerberg's effort, a cadre of antivaccine activists flooded the network with what Facebook calls 'barrier to vaccination' content" as "[t]hey used Facebook's own tools to sow doubt about the severity of the pandemic's threat and the safety of authorities' main weapon to combat it."  Ultimately, *The Wall Street Journal* reported that "internal communications reviewed by the Journal that offer an unparalleled picture of how Facebook is acutely aware that the products and systems central to its business success routinely fail and cause harm" and "show that Facebook has often made minimal or ineffectual efforts to address the issues and plays them down in public."

61.     In response to the revelations in the first five articles in The Facebook Files series, the price of Company common stock declined $13.97 per share, or nearly 4% across five trading days, from a close of $378.69 per share on September 10, 2021, to close at $364.72 per share on September 17, 2021.

62.     On September 21, 2021, *The Wall Street Journal* reported that, in response to its reporting in The Facebook Files, "Facebook Inc.'s Oversight Board said it is reviewing the company's practice of holding high-profile users to separate sets of rules, citing apparent inconsistencies in the way the social-media giant makes decisions."

63.     Additional corrective information surfaced after the market closed on September 21, 2021, when *The New York Times* reported that Zuckerberg had recently signed off on an initiative called "Project Amplify," which uses Facebook's own News Feed to "show people positive stories about the [Company]."  According to *The New York Times*, "[s]everal executives at the meeting [where the initiative was proposed] were shocked by the proposal," as Facebook "had not previously positioned the News Feed as a place where it burnished its own reputation."

64.     On this news, the price of Company common stock further declined $14.27 per share, or approximately 4%, from a close of $357.48 per share on September 21, 2021, to close at $343.21 per share on September 22, 2021.

65.     On September 27, 2021, Facebook announced that it had paused development of its "Instagram Kids" service—a product planned for children thirteen years old and younger. Defendants stated that the delay would "give us time to work with parents, experts, policymakers and

regulators, to listen to their concerns, and to demonstrate the value and importance of this project for younger teens online today."

66.     On October 3, 2021, CBS broadcasted a 60 Minutes interview with Frances Haugen, a former Facebook product manager who revealed herself as the source of the internal documents discussed in The Facebook Files.  During the interview, Haugen stated that, during her time at Facebook, she constantly saw "conflicts of interest between what was good for the public and what was good for Facebook.  And Facebook, over and over again, chose to optimize for its own interests, like making more money."

67.     Haugen explained that she chose to work at Facebook because she had lost a friend to online conspiracy theories and understood "how high the stakes were in terms of making sure there was high quality information on Facebook."  As a result, Haugen was compelled to take action after she saw Facebook dissolve its Civic Integrity unit—which worked on misinformation and other risks involving elections—after the 2020 U.S. election but prior to the January 6, 2021 insurrection at the U.S. Capitol.  As Haugen stated, "it was the moment where I was like, 'I don't trust that they're willing to actually invest what needs to be invested to keep Facebook from being dangerous.'"

68.     Haugen further explained that Facebook turned on certain safety systems to reduce misinformation prior to the 2020 U.S. election, but "as soon as the election was over, they turned them back off or they changed the settings back to what they were before to prioritize growth over safety."

69.     Ultimately, Haugen explained that "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click on less ads, they'll make less money."

70.     On this news, the price of Company common stock declined $16.78 per share, or nearly 5%, from a close of $343.01 per share on October 1, 2021, to close at $326.23 per share on October 4, 2021.

71.     Then, after the markets closed on October 21, 2021, *The Wall Street Journal* published an article revealing that internal documents demonstrate that the Company "is struggling to detect and deal with users[] creating multiple accounts on its flagship platform, according to internal

documents that raise new questions about how the social-media giant measures its audience." According to the internal documents reviewed by *The Wall Street Journal*, "the phenomenon of single users with multiple accounts [is] 'very prevalent' among new accounts" with "an examination of roughly 5,000 recent sign-ups on the service indicat[ing] that at least 32% and as many as 56% were opened by existing users."  Additionally, these documents show that "[t]he company's system for detecting such accounts also tends to undercount them."

72.     On this news, the price of Company common stock declined $17.27 per share, or approximately 5%, from a close of $341.88 per share on October 21, 2021, to close at $324.61 per share on October 22, 2021.

73.     After the end of the Class Period, on October 22, 2021, *The Washington Post* reported that a second former Facebook employee—a former member of the Company's Integrity team—had submitted a whistleblower affidavit to the SEC.  According to *The Washington Post*, the claims in the new affidavit "echoed many of those made by Frances Haugen," similarly alleging "that the company prizes growth and profits over combating hate speech, misinformation and other threats to the public."

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased Company common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, their agents, directors and officers of the Company, and their families and affiliates.

75.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

76.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.     Whether Defendants violated the Exchange Act;

b.     Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and/or misleading;

e.    Whether the price of Company common stock was artificially inflated; and

f.    The extent of damage sustained by members of the Class and the appropriate measure of damages.

77.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

78.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

79.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

80.    Plaintiff will rely upon the presumption of reliance establish by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    The omissions and misrepresentations were material;

c.    The Company's common stock traded in an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.    Plaintiff and the Class purchased Company common stock between the time Defendants misrepresented or failed to disclose material facts and the time the

true facts were disclosed, without knowledge of the misrepresented or omitted facts.

81.     At all relevant times, the market for the Company's common stock was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.   NO SAFE HARBOR

82.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

83.     Defendants are also liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false and/or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.  LOSS CAUSATION/ECONOMIC LOSS

84.     Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Company common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Company common stock during the Class Period, Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

IX.   **SCIENTER ALLEGATIONS**

85.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Company common stock during the Class Period.

X.   **CLAIMS AGAINST DEFENDANTS**

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**against All Defendants**

86.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

87.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

88.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
against the Individual Defendants**

90.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

91.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

93.     As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company common stock during the Class Period.

94.     **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 4:21-cv-08873                                                                                    21

b.     Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Awarding such other and further relief as the Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

95.    Plaintiff hereby demands a trial by jury.

DATED: November 16, 2021                    Respectfully submitted,

**KESSLER TOPAZ MELTZER
& CHECK, LLP**

/s/ *Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:  (415) 400-3000
Fax: (415) 400-3001

-and-

**KESSLER TOPAZ MELTZER
& CHECK, LLP**
NAUMON A. AMJED
(namjed@ktmc.com)
DARREN J. CHECK
(dcheck@ktmc.com)
RYAN T. DEGNAN
(rdegnan@ktmc.com)
KARISSA J. SAUDER
(ksauder@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax: (610) 667-7056

*Counsel for Plaintiff Barry G. Depot*